UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MARILYN E. TRIPLETT, Individually and as
Executrix of the Estate of JAMES K. TRIPLETT                                    PLAINTIFF

v.                                                                CIVIL ACTION NO. 3:01CV-11-S

MINNESOTA MINING AND MANUFACTURING COMPANY                        DEFENDANT

## MEMORANDUM OPINION

This matter is before the court on motion of the defendant, Minnesota Mining and Manufacturing Company ("3M"), for summary judgment in this product liability action.  The plaintiff, Marilyn E. Triplett, has filed this action on behalf of herself and her deceased husband, James K. Triplett, who died on July 17, 1999 of lung cancer allegedly caused by exposure to asbestos.  Triplett worked as a pipefitter from 1976 until 1985 at the Colgate-Palmolive plant in Jeffersonville, Indiana.  Triplett's estate alleges that he used a Model 8500 Nontoxic Particle Mask during at least one insulation removal project and that he was not adequately protected by it from exposure to asbestos dust.  The mask was manufactured and sold by 3M.

The defendant, 3M has moved for summary judgment on the grounds that (1) the mask was not defective;  (2) 3M had no duty to warn of potential dangers of other products it did not manufacture; and (3)  the sophisticated intermediary doctrine bars recovery against 3M.

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty*

*Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

I.

As an initial matter, the court must address the question of what substantive law to apply in this action. Triplett was a life-long resident of Kentucky. He worked in Indiana and was provided the mask in question by his employer in Indiana. He used the mask in Indiana, and was presumably exposed to airborne asbestos at the plant in Indiana. Triplett's alleged exposure resulting from the purported "unreasonably dangerous condition" of the mask occurred in Indiana.

The manifestation of alleged asbestos-related disease occurred in Kentucky when Triplett was diagnosed with lung cancer in late 1998 or early 1999. Triplett was diagnosed and treated in Kentucky.

This court sitting in diversity must apply Kentucky choice-of-law rules in determining which substantive law governs the action herein. *McGinnis v. Taitano*, 3 F.Supp.2d 767 (W.D.Ky. 1998), *citing, Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties agree that under the principles enunciated in *Wessling v. Paris*, 417 S.W.2d 259 (Ky. 1967) and its progeny, Kentucky courts will apply Kentucky law where Kentucky has a significant interest in the case. As noted in *Custom Products, Inc. v. Fluor Daniel Canada, Inc.*, 262 F.Supp.2d 767, 771 (W.D.Ky. 2003), there is "no doubt Kentucky prefers the application of its own laws over those of another forum." However, "although this principle should generally dictate the outcome,

- 2 -

there are occasions when a careful examination of the facts reveals that the case's actual connection to Kentucky is simply too remote to justify applying Kentucky law."

We find the language quoted in *Wessling, supra.*, a case involving Kentucky residents injured in an automobile accident which occurred in Indiana, to be instructive.  The court quoted certain proposed text for the Restatement (Second), Conflict of Laws, § 379(a):

> In an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, *unless some other state has a more significant relationship with the occurrence and the parties as to the particular issue involved, in which event the local law of the latter state will govern.*"

*Wessling, supra*. at 260-61 [emphasis in case].  In applying this rule, Kentucky courts have applied their own law where significant contacts with the Commonwealth are found, even if they are not necessarily the most significant contacts.  *See, Adam v. J.B. Hunt Transport, Inc.*, 130 F.3d 219  (6th Cir. 1997).  In *Wessling*, the court found that the occurrence of the injury "fortuitously" occurred in Indiana.  The happenstance of the accident was the only connection that Indiana had to the occurrence.  The court found, therefore, that the question as to the Kentucky guest passenger's right of action against the Kentucky driver should be determined by Kentucky law.

Similarly, in this case we determined that Triplett, a Kentucky resident whose alleged asbestos-related injury accrued in Kentucky upon manifestation of disease in his body, should be afforded the rights of one vested with a cause of action in Kentucky.  We found, therefore, that the Kentucky borrowing statute did not require application of the Indiana statute of repose to bar his claims.  We were addressing the question of the vesting of rights in a Kentucky resident, a subject with which Kentucky has a concern and for which it has applied the "discovery rule" in cases involving asbestos-related illness or disease.  *See*, Memorandum Opinion and Order of February 8, 2005 (DN 60).  Here, however, we are addressing the matter of which product liability law governs the claims of this Kentucky resident, employed in Indiana, who was allegedly injured on the job there.

Colgate-Palmolive is an Indiana manufacturer.  Triplett worked for many years in the Indiana plant.  The allegedly defective product was purchased by his employer and shipped to Indiana.  It was used in Indiana and allegedly caused injury to Triplett in Indiana.  Kentucky has no relationship to the occurrence or to the allegedly defective product.  Kentucky's relationship to this matter is strictly through Triplett's residence in Kentucky and subsequent illness there.  Thus we conclude that Indiana product liability law must be applied in this case.

II.

Indiana Code § 34-20-2-1 states:

> Except as provided in section 3 of this chapter, a person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:
>
> (1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;
> (2) the seller is engaged in the business of selling the product; and
> (3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is sold by the person sought to be held liable under this article.

Indiana law requires proof of both a defect in the product and unreasonable dangerousness:

> The requirement that the product be in a defective condition focuses on the product itself; whereas, the requirement that the product be unreasonably dangerous focuses on the reasonable contemplations and expectations of the consumer...In order for liability to attach....both elements must be present.

*Moss v. Crossman Corp.*, 136 F.3d 1169, 1174 (7th Cir. 1998), *quoting, Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 685 (Ind.Ct.App. 1991).

Indiana law states that a product is defective "if the seller fails to (1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer."  Ind. Code § 34-20-4-2.

- 4 -

There is no dispute that the product functioned as it was designed to function. The Model 8500 Nontoxic Particle Mask was designed, marketed and sold, as the package label indicated, for "filtration for nontoxic dusts, powders and spray particles."[1] The label also specifically stated "NOTE: For toxic dusts and vapors, use MESA/NIOSH approved mask." The parties agree that the mask itself was a physically benign product. Triplett contends that the product contained a latent dangerous characteristic inasmuch as it failed to provide protection against certain (ie. toxic) exposures. We reject the notion that the 8500 mask was defective because it did not provide protection against exposures which were beyond those for which the product was designed.

The Model 8500 Nontoxic Particle Masks were packaged in boxes of fifty. Triplett's co-worker, William E. Sigman, stated that these boxes, were "everywhere" in the plant, "in every building you went into." Sigman depo., pp. 135, 137. Sigman testified that he knew the Model 8500 masks because identifying information was stamped on all of the boxes. Sigman depo., pg. 38. Thus it appears that the masks' type and purpose was made apparent to employees who came into contact with the numerous boxes throughout the plant. The masks were not individually stamped with a warning as to exposures for which the mask would not provide protection. However, the only evidence on this point establishes that the masks were set out in the plant in their labeled boxes. *Id.* The masks' type and purpose was therefore plainly on display. Employees were not left to guess as to the type of mask they were putting on.

---

[1]Triplett has submitted the affidavit of Les Greathouse, a former safety director for Colgate-Palmolive. He stated that "[p]art of my responsibilities in that job was to purchase safety-related products that were used in the plant. I relied upon a local distributor, Orr Safety, for guidance in the field of industrial safety and the proper products to purchase. I purchased the plant safety supplies from that firm." While the affidavit indicates that the distributor provided assistance with purchasing, there is no evidence to suggest that 3M or its sales representative ever indicated that the Model 8500 mask would protect the user from toxic dust. In fact, the evidence in the case establishes that Colgate-Palmolive purchased a number of different types of masks and respirators for use in the plant. According to the testimony of co-worker Sigman, there was a storeroom with stock clerks in attendance where various respiratory equipment was kept. Sigman testified that there was a box of Model 8500 masks "in every building you went in," and that other respiratory equipment was "provided to supervision, your immediate boss." There is no evidence that the Model 8500 mask was represented by 3M to be efficacious for other than nontoxic dust, powders and spray particles, as indicated on the product packaging.

There is a complete absence of evidence concerning Triplett's particular familiarity with the 8500 mask or with the health risks associated with asbestos removal. His co-workers stated only that he wore Model 8500 masks frequently. On at least one occasion he is said to have worn a double thickness of the mask around toxic dust. His co-workers testified that it was generally known in the maintenance shop that removal of asbestos insulation could generate toxic dust and that exposure to such dust was hazardous. *See, ie.*, Sigman depo., pp. 115-118; 131-134.

There is no evidence that the packaging fostered any sort of misconception about the 8500 mask's properties with respect to exposure to toxic dust. The evidence of record concerning the decision of Triplett's co-workers to wear the 8500 mask when removing asbestos material is that they wore what was at hand (Newland Affidavit, pg. 1), that they were instructed by their supervisors to wear what was at hand (Sigman depo., pg. 136; Gootee Affidavit, pg. 1), or that they did not ask for more sophisticated respiratory protection because it wasn't usually available (Newland Affidavit, pg. 1; Sigman depo., pp. 137-139; 145). Inasmuch as the employees were aware that asbestos insulation removal could generate toxic dust, the packaging was labeled "Model 8500 Nontoxic Particle Mask" and additionally bore a note instructing that a MESA/NIOSH approved mask be used for toxic exposures (Triplett Exhibit 13 to Opposition to Motion for Summary Judgment), no reasonable jury could find the mask defective for lack of an adequate warning of the product's properties.

We find that there is no genuine issue of material fact as to defectiveness of the Model 8500 mask, and 3M is entitled to judgment as a matter of law.

III.

The plaintiff urges that the 8500 mask was unreasonably dangerous due to lack of an adequate warning designed to prevent foreseeable misuse of the product.[2]

---

[2]To some extent, this argument appears to collapse into the question of defectiveness of the product. In *Jarrell v. Monsanto*

(continued...)

- 6 -

'Unreasonably dangerous,' for purposes of IC 34-20, refers to any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." Ind. Code § 34-6-2-146.  As noted in *Moss, supra*., Indiana law creates an objective standard under which the court must take into account "the reasonably anticipated knowledge, perception, appreciation, circumstances, and behavior of expected users.

*Moss,* 136 F.3d at 1175.

Triplett suggests that the "community of consumers" in this instance is the community of industrial workers exposed to various types of dust and fumes, including asbestos dust.  He contends that 3M knew that this community of consumers was using the 8500 mask during exposures to toxic dust and that this use of the product exposed the workers to harm beyond that which an ordinary worker would contemplate.  He contends that this knowledge created a duty to provide a warning that would adequately inform the workers of the risk of harm from their misuse of the mask.

Assuming *arguendo* that Triplett had admissible evidence to support its contention that 3M had knowledge of misuse of its product at the Colgate-Palmolive plant at the time of Triplett's alleged toxic exposure,[3] we conclude that Colgate-Palmolive was a sophisticated intermediary charged with the duty of ensuring proper respiratory protection for its employees.

The undisputed evidence in the case is that it purchased and had in the plant various types of respiratory protection devices which included devices for toxic as well as nontoxic exposures.  The Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq*., mandated the formation

---

[2](...continued)

*Co.*, 528 N.E.2d 1158, 1166 (Ind.Ct.App. 1988), a panel of the Indiana Court of Appeals noted that "it adds nothing to require that a product unreasonably dangerous by reason of inadequate warnings also be in a 'defective condition.'  The lack of adequate warning makes a dangerous product unreasonably dangerous.  Liability attaches without proof of some additional 'defective condition.'"  However, a year after the decision in *Jarrell*, the Indiana Supreme Court in *Koske v. Townsend Engineering Co.*, 551 N.E.2d 437 (Ind. 1990) reaffirmed a distinction between the two elements.  *See, Moss*, 136 F.3d at 1174.  This court has compartmentalized the arguments relating to the terms "defectiveness" and "unreasonably dangerous" in this opinion, but we suggest that the analysis appears equally applicable to either element, despite the Indiana courts' continued distinction between the two.

[3]A point which 3M does not concede.

and implementation of respiratory safety programs to protect workers.  Colgate-Palmolive's

Respiratory Protection Program (Triplett Exhibits 17 and 18) evidences that it had a plan in place

for the evaluation and selection of respiratory protection devices to be used in the various

environments encountered in the plant.

> Under Indiana law, there is no doctrinal distinction between the negligent and strict
> liability failure-to-warn actions.  See *Natural Gas Odorizing, Inc. v. Downs*, 685
> N.E.2d 155, 163 n. 11 (Ind.Ct.App. 1997).  In both cases, a manufacturer has a duty
> to warn those persons it should reasonably foresee would be likely to use its product
> or who are likely to come into contact with a latent danger inherent in the product's
> use.  See *id.* at 162.  Although this duty to warn the ultimate consumer is sometimes
> described as "non-delegable," see, *e.g., id.* at 163, the Indiana Appellate Court has
> clearly recognized the "sophisticated intermediary" defense which holds that there
> is no duty to warn an ultimate user when the product is sold to a "knowledgeable or
> sophisticated intermediary" whom the manufacturer has adequately warned.  *Id.* at
> 163 n. 10...Delegation of the duty to warn makes particular sense where the
> manufacturer cannot control how the intermediary will use the product...In order for
> the exception to apply, however, the intermediary must have knowledge or
> sophistication equal to that of the manufacturer, and the manufacturer must be able
> to rely reasonably on the intermediary to warn the ultimate consumer.

*Taylor v. Monsanto Co.*, 150 F.3d 806 (7th Cir. 1998).

Triplett contends that Colgate-Palmolive was not as sophisticated as 3M in the area of

respiratory protection devices.  Its contention is based upon a citation issued to Colgate-Palmolive

in 1984 for a number of OSHA violations relating to respirators.  Colgate-Palmolive was cited for

(1) failing to establish written standard operating procedures, (2) failing to adequately instruct and

train employees, and (3) for failing to inspect respirators monthly for emergency use.  None of these

violations call into question Colgate-Palmolive's level of sophistication.  Rather they evidence that

at that point in time, the company was deficient in a number of respects in implementing its

program.  The Respiratory Protection Program contains guidelines for the selection of appropriate

respiratory protection devices which evidences particular knowledge in the area of respiratory

protection.

There is no evidence creating a genuine issue of material fact concerning whether Colgate-Palmolive had the sophistication necessary to discern that a mask designed and sold for use in exposures to nontoxic materials should not be used in a toxic environment.  It was required by law to possess such knowledge and to have a program in place to make informed decisions concerning the use of  appropriate respiratory devices.  Colgate-Palmolive had such a program in place.  It purchased respiratory protection devices for both toxic and nontoxic exposures.  There is no evidence to suggest that 3M could not reasonably rely upon the sophistication of Colgate-Palmolive in utilizing proper respiratory protection for its employees in various manufacturing environments.

Triplett attempts to call into question the qualifications of Les Greathouse to hold the position of Safety Director on the ground that he did not have formal education in the field of industrial safety and that he consulted Orr Safety for guidance with respect to the proper products to purchase.  There is, however, no evidence challenging the adequacy of the respiratory protection program guidelines which were in force during Greathouse's tenure as Safety Director, nor has there been a suggestion that improper respiratory products were purchased for the plant environment.  Rather, the challenges are limited to the implementation of the program and, in connection therewith, the failure of Colgate-Palmolive to prevent the misuse of the Model 8500 mask.  These contentions address responsibilities of Colgate-Palmolive rather than 3M.

Conclusion

For the reasons set forth hereinabove, the court concludes that no genuine issue of material fact exists and 3M is entitled to summary judgment as a matter of law.  Indiana law applies to the claims herein.  The court concludes that on the evidence of record, Triplett cannot establish that the product is defective under Ind. Code § 34-20-4-2.  Further, the court concludes that the claims against 3M are barred by the sophisticated intermediary doctrine, as set forth in *Taylor v. Monsanto Co*., 150 F.3d 806 (7th Cir. 1998).

A separate order will be entered this date in accordance with this opinion.